# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEON GREEN and WALDO TEJADA,
individually and on behalf of all others
similarly situated,
     *Plaintiffs*,

     v.

XPO LAST MILE, INC.,
     *Defendant*.

No. 3:19-cv-01896 (JAM)

## ORDER DENYING MOTION TO COMPEL ARBITRATION

Arbitration is a creature of contract law. "Because arbitration is based on a contractual relationship, a party who has not consented cannot be forced to arbitrate a dispute." *Bd. of Educ. of the Town of New Milford v. New Milford Educ. Ass'n*, 331 Conn. 524, 541 (2019).

This case involves important questions of arbitration contract law arising in the context of a class action lawsuit by two delivery drivers—Leon Green and Waldo Tejada—against XPO Last Mile, Inc., a company that specializes in merchandise deliveries. Green and Tejada claim that XPO failed to treat them as employees for purposes of Connecticut's wage law.

XPO now moves to compel arbitration. It does so on the basis of arbitration clauses that are set forth within certain delivery service contracts entered into between XPO and limited liability companies owned by Green and Tejada. According to XPO, these arbitration clauses are *personally* binding on Green and Tejada so that they must arbitrate their personal claims against XPO.

I do not agree. In light of well-established principles of corporate and agency law, I conclude that Green and Tejada are not parties to the agreements that they signed with XPO in their capacity as agents of limited liability companies. I further conclude that Green and Tejada are not otherwise estopped from declining to arbitrate their claims with XPO. Accordingly, I will

deny XPO's motion to compel arbitration.

## BACKGROUND

XPO is a national logistics company that serves as a kind of delivery middle-man for merchandise companies like Lowe's, Ikea, and Amazon. As a third-party logistics provider and freight forwarder, it contracts with the big box stores for the delivery of goods, then in turn contracts with motor carriers to ship the goods to the customers who have ordered them.[1]

Green and Tejada filed this class action complaint arising from their work as delivery drivers for XPO in Connecticut.[2] They allege that, notwithstanding XPO's effort to categorize them as independent contractors, XPO exercises such a high degree of oversight and control over their daily work activities that they should be deemed employees with full entitlement to the benefits that employees enjoy under Connecticut's statutory wage payment law.[3] In particular, they allege that XPO deducts certain expenses from the compensation it pays drivers (*e.g.*, for insurance and uniforms) while also compelling its drivers to assume certain expenses (*e.g.*, for vehicle maintenance and fuel costs)—and that XPO as their employer should assume these costs rather than imposing them on its employees.[4]

Count One of the complaint alleges that XPO made unlawful wage deductions in violation of Conn. Gen. Stat. § 31-71e.[5] Count Two alleges a common law claim for unjust enrichment.[6] The complaint seeks injunctive relief and damages.[7]

---

[1] *See* Doc. #1 at 3 (¶ 14); Doc. #19-2 at 1 (¶¶ 2-3); *see also Hayes v. XOP Last Mile, Inc.*, 2017 WL 4900387, at *2 (W.D. Mich. 2017) (describing functions of XPO Last Mile, Inc. to provide "last mile" logistics for delivery services in more than 800 cities in the United States and working with more than 5,000 contract carriers nationwide).
[2] Doc. #1 at 1-2 (¶¶ 2-3).
[3] *Id.* at 3-6 (¶¶ 15-24).
[4] *Id.* at 6-7 (¶¶ 25-26).
[5] *Id.* at 8 (¶¶ 33-35).
[6] *Ibid.* (¶ 36).
[7] *Id.* at 9.

XPO has moved to compel arbitration. It relies on arbitration clauses that are set forth in the terms of certain Delivery Service Agreements that it entered into in connection with the delivery services furnished by Green and Tejada.

The record includes three such Delivery Service Agreements. The first is between XPO and an entity named "Lg Family Llc," and this agreement is signed by a representative of XPO and by Green as "Business Owner" for "Lg Family Llc."[8] The second and third agreements are between XPO and entities named "TEJADA EXPRESS LLC" and "Tejada Express trucking LLC," and they are signed by representatives of XPO and by Tejada as "Business Owner" for both "TEJADA EXPRESS LLC" and "Tejada Express trucking LLC."[9] According to XPO, it has paid more than $3 million to these three limited liability companies (LLCs) for delivery services performed by at least 15 drivers and helpers.[10]

Except for the names of each LLC, the terms of the Delivery Services Agreements have identical terms. The agreements specify the responsibilities of each party, while using terms to implicitly and explicitly disavow the existence of any employer-employee relationship between XPO and the LLCs or the employees of the LLCs.[11] The agreements also disclaim the existence

---

[8] Doc. #19-4 at 2-16.

[9] *Id.* at 18-32, 34-48.

[10] Doc. #19-2 at 1-2 (¶¶ 5-7). Tejada and Green have filed declarations stating that they earn modest income from their work as delivery drivers. Docs. #26-2, #26-3.

[11] *See, e.g.,* Doc. #19-4 at 3 (stating in part the objectives of the agreement to achieve "delivery and installation services which meet the service levels of XPO Last Mile's customers" and that "[t]he manner and means of obtaining such results are entirely within the discretion of Contract Carrier"); *id* at 4 (Section 3.1: "Contract Carrier acknowledges that it maintains discretion and control to accomplish its obligations under this Agreement."); *id.* at 5 (Section 4.1: "It is expressly intended by the Parties hereto, and Contract Carrier hereby specifically warrants, represents and agrees, that Contract Carrier and XPO Last Mile are independent entities having their own established businesses," and that "XPO Last Mile and Contract Carrier intend that this Agreement is strictly between two independent entities and does not create an employer/employee relationship for any purpose."); *id.* at 7 (Section 5: stating in part that that the LLC "retains complete and exclusive direction and control over its employees and all those working for it in any capacity" and that "such persons shall not be considered employees of XPO Last Mile"). These citations are to XPO's agreement with Lg Family Llc; because all the Agreements are the same, I do not cite corresponding provisions of the other two agreements.

of any agency relationship between the parties.[12]

Referring to each of the LLCs generically as a "Contract Carrier," each of the Agreements states that it is "binding upon the Parties and their respective successors and assigns, but Contract Carrier's obligations under this Agreement are not assignable without the prior written consent of XPO Last Mile."[13] Apart from any successors or assignees, the Agreements do not purport to be binding on any third party including on any owner, agent, or employee of any of the contracting parties.

Each Agreement also includes arbitration clauses. These clauses state in relevant part that "[t]he parties agree that any demand, assertion, or claim or cause of action for money, property, enforcement of a right, or equitable relief, including but not limited to allegations of misclassification or wage and hour violations … arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association ('AAA') under its Commercial Arbitration Rules."[14]

## DISCUSSION

XPO has moved to compel arbitration. When deciding a motion to compel arbitration, courts apply a "standard similar to that applicable for a motion for summary judgment." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016). Courts must "consider all relevant, admissible evidence submitted by the parties and contained in pleadings, . . . together with . . . affidavits," and must "draw all reasonable inferences in favor of the non-moving party." *Ibid.*

---

[12] *Id.* at 15 (Section 23).

[13] *Id.* at 16 (Section 27).

[14] *Id.* at 13 (Section 21.1). The arbitration clauses in the Agreements go on to impose additional limitations that are the subject of much of the parties' briefing but that it is unnecessary for me to address in light of my ruling here that plaintiffs are not parties to the Agreements or bound by them under any principle of estoppel.

Because XPO claims that plaintiffs as transportation workers are required to engage in arbitration, the parties agree that any arbitration requirement is governed by the Connecticut Arbitration Act rather than by the Federal Arbitration Act. *See New Prime Inc., v. Oliveira*, 139 S. Ct. 532, 536 (2019) (discussing scope of transportation worker exemption under the Federal Arbitration Act); *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 16-26 (1st Cir. 2020) (applying federal transportation worker exemption to arbitration involving "last mile" delivery workers).

 The Connecticut Arbitration Act provides in relevant part:

> An agreement in any written contract … to settle by arbitration any controversy thereafter arising out of such contract, or out of the failure or refusal to perform the whole or any part thereof …or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit … shall be valid, irrevocable and enforceable, except when there exists sufficient cause at law or in equity for the avoidance of written contracts generally.

Conn. Gen. Stat. Ann. § 52-408.

A motion to compel arbitration requires a court to consider at the outset whether the parties have actually agreed to arbitrate. *See, e.g.*, *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019). Because arbitration is a creature of contract, I must consider whether—as a matter of Connecticut contract law—the parties to this lawsuit have agreed to arbitration. Still, because arbitration issues present themselves in similar contexts under both the Federal Arbitration Act and the Connecticut Arbitration Act, a court that seeks to discern the contours of Connecticut law in the arbitration context should do so while cognizant that Connecticut courts in turn often look to federal decisions for guidance. *See, e.g.*, *Nussbaum v. Kimberly Timbers, Ltd.*, 271 Conn. 65, 73 n.6 (2004) (comparing Connecticut Arbitration Act to Federal Arbitration Act and stating that "[i]n construing a Connecticut statute that is similar to federal law, we are guided by federal case law").

5

As an initial matter, XPO argues that it is not for me but for an arbitrator to decide if the parties agreed to arbitration, because the Delivery Service Agreements expressly delegate to the arbitrator "exclusive authority to resolve any dispute relating to the formation" of the arbitration agreement.[15] I do not agree. As the Connecticut Supreme Court has made clear, "because an arbitrator's jurisdiction is rooted in the agreement of the parties . . . a party who contests the making of a contract containing an arbitration provision cannot be compelled to arbitrate the threshold issue of the *existence* of an agreement to arbitrate. Only a court can make that decision." *Nussbaum*, 271 Conn. at 72-73.

XPO's contrary argument errantly relies on precedent involving delegation to an arbitrator of *arbitrability* (*i.e.*, whether an arbitration agreement that the parties have formed extends to a particular claim) rather than *formation* (*i.e.*, whether there was any agreement at all among the parties to arbitrate). But the Second Circuit has explained that while parties may "agree to arbitrate . . . whether the arbitration clause applies to a particular dispute, or whether it is enforceable, parties may not delegate to the arbitrator the fundamental question of whether they formed the agreement to arbitrate in the first place." *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 (2d Cir. 2019).

This is because "[a]n agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all," and "[t]o take the question of contract formation away from the courts would essentially force parties into arbitration when the parties dispute whether they ever consented to arbitrate anything in the first place." *Ibid.* XPO's argument to the contrary is hard to understand in light of the fact that it cites by way of footnote

---

[15] Doc. #19-4 at 13-14 (Section 21.5 of the Delivery Service Agreement stating in part that "the arbitrator, and not any federal, state, or local court, shall have exclusive authority to resolve any dispute relating to the formation, enforceability, applicability, or interpretation of this Arbitration Agreement, including without limitation any claim that this Arbitration Agreement is void or voidable").

a decision from the Seventh Circuit for the same proposition that "questions about contract formation, *i.e.*, the existence of an arbitration agreement, are for courts not arbitrators to decide." Doc. #30 at 4 n.4 (citing *Janiga v. Questar Capital Corp.*, 615 F.3d 735 (7th Cir. 2010)).

In any event, the predicate issue of contract formation goes not only to whether a contract to arbitrate has been formed at all but also to the identity of the parties to that agreement. In other words, "whether an entity is a party to the arbitration agreement also is included within the broader issue of whether the parties agreed to arbitrate." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 95 (2d Cir. 1999).

Therefore, it is for me—and not an arbitrator—to decide if Green and Tejada are parties to an arbitration agreement with XPO. I conclude they are not. Each of the Delivery Service Agreements identifies only an LLC and XPO as "the 'Parties'" to the Agreement.[16] Each Agreement states that it "is binding upon the Parties and their respective successors and assigns," without suggestion that it is binding on any other person or entity.[17] More to the point, each of the arbitration clauses within the Agreements purports to bind only the parties to any agreement to arbitrate: "[t]he *parties* agree that any demand . . . arising out of or relating to the Agreement . . . shall be settled by arbitration," and further stating that "this Arbitration Agreement applies to any existing or future dispute brought by *either* Contract Carrier *or* XPO Last Mile arising out of or related to the Agreement."[18]

---

[16] *See, e.g.*, Doc. #19-4 at 3 (referring in the first paragraph of the Agreement to Lg Family Llc as the "Contract Carrier" and stating that "XPO Last Mile and Contract Carrier shall be collectively referred to as the 'Parties'").

[17] *Id.* at 16 (Section 27).

[18] *Id*. at 13 (Section 21.1) (emphasis added). The fact that the same arbitration clause goes on to provide for arbitration of "misclassification or wage and hour violations" does not signify that individual non-party drivers are parties to the Agreement because it is perfectly plausible that such misclassification disputes would arise in the context of an effort by the LLCs to implead or to seek to spread liability to XPO for the misclassification claims of the *LLCs*' workers against the LLCs.

To be sure, the names of Green and Tejada appear as signatories to the Agreements, but their signatures appear in a representative capacity (as putative "business owner" of each LLC), not in their personal and individual capacity. Under Connecticut law, "[a] limited liability company is an entity distinct from its member or members." Conn. Gen. Stat. § 34-243g(a); *see also Gould v. City of Stamford*, 331 Conn. 289, 309 (2019) ("business entities organized as limited liability companies are entirely distinct from their members").

It is hornbook law that the fact that a corporate owner or agent may sign a contract on a company's behalf does not mean—without more—that the owner or agent is *personally* a party to the contract. "Unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." *Rich-Taubman Assocs. v. Comm'r of Revenue Servs.*, 236 Conn. 613, 619 (1996) (quoting Restatement (Second) of Agency § 320).

Likewise, "an agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute his personal liability for, or to, that of his principal." *Joseph Gen. Contracting, Inc. v. Couto*, 317 Conn. 565, 582 (2015); *see also Restatement (Third) of Agency* § 6.01 ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, (1) the principal and the third party are parties to the contract; and (2) the agent is not a party to the contract unless the agent and third party agree otherwise.").

In light of these basic principles, the Fifth Circuit has concluded that a corporate officer's signature on behalf of his company with another company did not bind the officer to arbitrate any personal claims against the other company despite the fact that the contract required the corporate parties themselves to arbitrate any claims arising under or related to the work to be

performed under the contract. *See Covington v. Aban Offshore Ltd.*, 650 F.3d 556, 557-62 (5th Cir. 2011) (applying Texas law). To similar effect, other federal appeals courts have acknowledged that "[i]t is common ground that '[s]igning an arbitration agreement as agent for a disclosed principal is not sufficient to bind the agent to arbitrate claims against him personally.'" *McCarthy v. Azure*, 22 F.3d 351, 361 (1st Cir. 1994) (quoting *Flink v. Carlson*, 856 F.2d 44, 46 (8th Cir. 1988)); *see also Usina Costa Pinto S.A. Acucar E Alcool v. Louis Dreyfus Sugar Co., Inc.*, 933 F. Supp. 1170, 1178 (S.D.N.Y. 1996) ("signing an arbitration agreement as an agent for a disclosed principal is not sufficient to render the agent a party to the arbitration clause"). This reasoning requires me to reject any argument that Green and Tejada are personally "parties" to the arbitration agreement.[19]

Unable to show that Green or Tejada were themselves parties to the Agreements, XPO argues that Green and Tejada are nonetheless bound to arbitrate under the Agreements. The Second Circuit has recognized "five theories for binding nonsignatories [non-parties] to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773,

---

[19] My prior ruling in *Andreoli v. Comcast Cable Commc'ns Mgmt., LLC*, 2020 WL 1242919 (D. Conn. 2020), is not to the contrary. In *Andreoli*, I concluded under applicable principles of Illinois law that a chief executive officer of a company consented to arbitration of her claims by reason of having signed an agreement in her corporate capacity which stated that for purposes of the agreement to arbitrate, "the parties" to be bound by the arbitration clause included "the parties' respective subsidiaries, affiliates, *agents*, *employees*, predecessors in interest, successors and assigns." *Id.* at *2 (emphasis added). Thus, the president knew that she was agreeing to personally bind herself when she signed the contract in a representative capacity. Here, by contrast, none of the Agreements at issue purport to bind any owner, employee, or agent of the LLCs to arbitration for personal capacity claims. The Agreements do not do so despite having a separate provision in each Agreement that contemplates and makes express reference to LLC employees. Doc. #19-4 at 7 (Section 5: stating in part that that the LLC "retains complete and exclusive control over its employees and all those working for it in any capacity" and that "such persons shall not be considered employees of XPO Last Mile"); *cf. Gould*, 331 Conn. at 309-10 (discussing how even a member of a single-member LLC may be subject to treatment as an employee of the LLC for workers compensation purposes).

776 (2d Cir. 1995); *see also Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129

(2d Cir. 2003) (same); *Henry v. Imbruce*, 178 Conn. App. 820, 841 (2017) (same).[20]

Although XPO makes no argument at all about the first four of these theories and

therefore has forfeit any argument for them, I will briefly explain why none of these first four

theories apply here. As to the first theory (incorporation), the Second Circuit instructs that "[a]

nonsignatory [non-party] may compel arbitration against a party to an arbitration agreement

when that party has entered into a separate contractual relationship with the nonsignatory which

incorporates the existing arbitration clause." *Thomson-CSF*, 64 F.3d at 777. XPO does not show

that Green or Tejada entered into some other contract that was incorporated by any of the

Agreements at issue here.

As to the second theory (assumption), the Second Circuit instructs that "[i]n the absence

of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates

that it is assuming the obligation to arbitrate." *Ibid.* XPO does not show any such affirmative

assumption of arbitration obligations by Green or Tejada.

As to the third theory (agency), the Second Circuit instructs that "[t]raditional principles

of agency law may bind a nonsignatory [non-party] to an arbitration agreement." *Ibid.* But here,

as I have explained above, traditional agency principles preclude holding Green and Tejada to be

parties on the basis of their signatures in a corporate representative or agent capacity on behalf of

the LLCs. Nor is there any argument or evidence that the LLCs were themselves agents of Green

and Tejada for purposes of binding them personally to any agreement to arbitrate.

---

[20] Decisions such as *Thomson-CSF* and others often use the term "signatories" and "non-signatories" to distinguish between "parties" and "non-parties" to an arbitration agreement. As I have discussed above, Green and Tejada were "non-parties" to any arbitration agreement notwithstanding that they were technically "signatories" to the agreements in a corporate agent capacity.

As to the fourth theory (veil piercing and alter ego), the Second Circuit instructs that "[i]n some instances, the corporate relationship between a parent and its subsidiary are sufficiently close as to justify piercing the corporate veil and holding one corporation legally accountable for the actions of the other." *Ibid.* But here, although the record is sparse concerning the *bona fides* of each LLC, there has been no fact-specific showing of any abuse of the corporate form by Green and Tejada.

That leaves the fifth and final theory—estoppel—the only theory which XPO actually argues. Doc. #30 at 9-10. By way of background, the case law recognizes two types of estoppel in the arbitration non-party context—one called "alternative estoppel" (or "alternate estoppel") and another called "direct benefits estoppel." Both have been applied in the context of evaluating whether one person or entity should be required to arbitrate with another person or entity notwithstanding the lack of an arbitration agreement between them. *See, e.g., MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61-62 (2d Cir. 2001) (discussing both). Although XPO's briefing indiscriminately lumps these two types of estoppel together, there are vital distinctions between them as I will discuss below.

Alternative estoppel allows for a *non*-party to an arbitration agreement to invoke arbitration under certain circumstances against a party who has otherwise agreed to arbitrate a dispute with a third party. The Second Circuit has explained that if one party ($x$) agrees to arbitrate with another party ($y$), then $x$ may be found to have impliedly consented to arbitrate with a non-party ($y^1$) to the arbitration agreement provided that two pre-conditions are true: (1) that "the relationships among the parties developed in a manner that made it unfair for $x$ to claim that its agreement to arbitrate ran only to $y$ and not to $y^1$" and (2) that "the subject matter of the dispute was intertwined with the contract providing for arbitration." *Sokol Holdings, Inc. v. BMB*

11

*Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008). Thus, for example, an employee who has signed an arbitration agreement with her employer may be required to arbitrate her discrimination claims against not only her employer but also a non-party to the arbitration agreement who worked closely with her employer and was functionally her co-employer. *See Ragone v. Atlantic Video at the Manhattan Center*, 595 F.3d 115, 126-27 (2d Cir. 2010).

It should be readily evident that alternative estoppel does not fit the facts here. The facts here do not involve the attempt of a *non*-party to an arbitration agreement to conscript into arbitration a person or entity who is party to an arbitration agreement with a third party. Quite the reverse, the facts here involve a *party* (XPO) to an arbitration agreement who seeks to conscript into arbitration persons (Green and Tejada) who have not personally agreed with anyone to arbitrate their claims. As the Second Circuit pointed out in *Thomson-CSF*, this "inverse" situation is an "important" distinction from the usual context for alternative estoppel, because "[a]rbitration is strictly a matter of contract; if the parties have not agreed to arbitrate, the courts have no authority to mandate that they do so." 64 F.3d at 779. For this reason, the Second Circuit in *Thomson-CSF* declined to apply alternative estoppel theory to bind a company that had never agreed to arbitrate with anyone in the first place. *See ibid.*

The same reasoning requires me to reject XPO's alternative estoppel argument here. Because non-parties like Green and Tejada have by definition not agreed to *any* arbitration at all, it is far less plausible by means of any estoppel theory to infer their consent to arbitration than to infer—in the usual alternative estoppel scenario—the consent of party *x* to arbitrate with non-party *y*[1] if party *x* has already consented to arbitrate on the same subject matter with related party *y*. As Judge Hiller of the Connecticut Superior Court has aptly noted, alternative estoppel "only applies when a nonsignatory who is closely related to a signatory to an agreement with an

arbitration clause wants to compel a signatory to that same agreement to arbitrate," but "[t]his theory cannot be used in reverse by a signatory to an agreement to compel a nonsignatory to arbitrate, no matter how closely affiliated the nonsignatory might be with the signatory." *Kuryla v. Coady*, 2013 WL 1494223, at *11 (Conn. Super. Ct. 2013).

So far as I can tell, the Connecticut Supreme Court has yet to pass upon the validity of alternative estoppel in the arbitration context. But because I conclude that alternative estoppel does not apply to the facts in this case and because Green and Tejada have not argued that alternative estoppel is invalid under Connecticut law, I have no need now to consider the validity of the doctrine as a matter of state contract law. *See, e.g., Santich v. VCG Holding Corp.*, 443 P.3d 62, 64-66 (Colo. 2019) (rejecting arbitration-specific alternative estoppel rule to the extent it departs from traditional elements of equitable estoppel under Colorado law); *Andreoli*, 2020 WL 1242919, at *3-*5 (same for Illinois law) (citing *Ervin v. Nokia, Inc.*, 349 Ill. App. 3d 508, 514-16 (2004)).

That brings me to the second type of estoppel—direct benefits estoppel—which allows for a party to an arbitration agreement to invoke arbitration against a *non*-party to the agreement if the non-party has directly benefited from the terms of the agreement in a manner that would make it unfair for the non-party to be able to enjoy the fruits of the agreement without sharing in its obligation to engage in arbitration of disputes. As the Connecticut Supreme Court has explained, "[o]ne enjoying rights is estopped from repudiating dependent obligations which he has assumed; parties cannot accept benefits under a contract fairly made and at the same time question its validity." *See Schwarzschild v. Martin*, 191 Conn. 316, 321-22 (1983). The notion supporting direct benefits estoppel is that a non-party "'knowingly exploiting an agreement with an arbitration clause can be estopped from avoiding arbitration despite having never signed the

agreement.'" *Trina Solar US, Inc. v. Jasmin Solar Pty Ltd*, 954 F.3d 567, 572 (2d Cir. 2020)

(quoting *MAG Portfolio*, 268 F.3d at 61).

It should be readily evident that the facts here are far more susceptible to an argument for direct benefits estoppel than for alternative estoppel. The facts fall into the same categories that are applicable to direct benefits estoppel—a party (XPO) to an arbitration agreement seeks to conscript into arbitration non-parties (Green and Tejada) to the arbitration agreements on the theory that it is unfair not to require the non-parties to arbitrate because they have derived benefits from the contractual agreements.

But as Judge Hall has observed, "the doctrine of direct benefit estoppel is a narrow one," and its "purpose is to prevent a nonsignatory from cherry-picking the terms that it likes and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause)." *Doctor's Assocs. Inc. v. Edison Subs, LLC*, 2014 WL 29128, at *3 (D. Conn. 2014) (internal quotations omitted). Thus, direct benefits estoppel does not apply merely because a non-party has derived some type of benefit from the parties' business dealings in general. Instead, for direct benefits estoppel to apply, "[t]he benefits must be direct—which is to say, flowing directly from the agreement," as distinct from "indirect where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *MAG Portfolio*, 268 F.3d at 61.

The record here does not show a *direct* benefit to Green or Tejada flowing from the terms of the Delivery Service Agreements themselves, as distinct from the *indirect* benefits they received from their general business dealings with XPO. *See Trina Solar*, 954 F.3d at 572-73 (declining to apply direct benefits estoppel because, although the non-party "surely benefited from the contractual relationship" between the parties, the evidence did not show that the non-

14

party "ever invoked the Contract to demand delivery" of the goods in question and the "Contract itself does not provide [the non-party] any direct benefit"); *Thomson-CSF*, 64 F.3d at 778-79 (corporate parent owner of subsidiary not direct beneficiary of subsidiary's contract with supplier despite other general benefits derived by owner parent from parties' business dealings).

The First Circuit has rejected a direct benefits estoppel argument on facts similar to this case. *See Ouadani v. TF Final Mile LLC*, 876 F.3d 31 (1st Cir. 2017). The plaintiff in *Ouadani* was a delivery driver for Dynamex, a final-mile delivery company much like XPO, and the plaintiff was instructed by Dynamex that he must associate himself with another company known as SBS (owned and operated by another driver) which had entered into an independent contractor agreement with Dynamex. When the plaintiff driver later filed suit against Dynamex claiming—like Green and Tejada—that he had been wrongly classified as an independent contractor rather than an employee, Dynamex moved to compel arbitration on the basis of an arbitration clause in its independent contractor agreement with SBS. Although Dynamex argued that the plaintiff driver "knowingly sought and obtained benefits from the Agreement because he performed the 'Contracted Services' pursuant to the Agreement for compensation" and that "the Agreement would be 'useless' without drivers like Ouadani to perform the contemplated services," the First Circuit found these arguments to be "unpersuasive because the benefits of the arbitration clause of the Agreement accrue to the contracting signatories—Dynamex and SBS— not to Ouadani." *Id.* at 38.

To be sure, the facts in *Ouadani* are somewhat distinguishable from the facts here because there was no evidence that Ouadani was even aware of the existence of the agreement between Dynamex and SBS with the arbitration clause. Here, by contrast, the facts show that Green and Tejada were aware of the relevant agreements between the LLCs and XPO. But, as

discussed above, their knowledge of the agreements was acquired solely in a corporate representative capacity, and there is nothing in the record before me to show that they personally obtained any direct benefit from the agreements themselves as distinct from the indirect benefits they received as a result of their general business dealings as delivery drivers for XPO.

As XPO's evidence reflects, XPO paid more than $3 million over the years to the three LLCs owned by Green and Tejada. But XPO's evidence also reflects that numerous drivers and helpers were associated with these LLCs, and Tejada and Green both attest to modest earnings from their delivery service work for XPO. And there is no evidence of direct benefits paid under the Delivery Service Agreements to Green and Tejada personally as distinct from payments made under the Agreements' terms to the LLCs and that may have indirectly flowed to Green, Tejada, and other employees or agents of the LLCs.

Indeed, notwithstanding the general benefit that Green and Tejada may have derived from working for XPO, the very theory of their complaint in this action is that XPO wrongfully treated them as independent contractors rather than employees. To the extent that the Agreements in turn serve as legal window dressing for XPO to perpetrate this miscategorization of Green and Tejada as independent contractors rather than as employees, then the record suggests that the Agreements not only failed to directly benefit Green and Tejada but actually *deprived* them of benefits by means of contract terms that were calculated to nullify any rights of Green and Tejada to be treated as employees rather than independent contractors.

In short, I conclude that Green and Tejada are not parties to the Agreements and hence to the arbitration clauses in the Agreements. I further conclude that Green and Tejada are not equitably estopped—either by alternative estoppel or direct benefits estoppel—from declining to

arbitrate their personal claims of liability against XPO. Accordingly, I will deny XPO's motion to compel arbitration.

CONCLUSION

For the reasons set forth above, XPO's motion to compel arbitration (Doc. #19) is DENIED. It is so ordered.

Dated at New Haven this 30th day of November 2020.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge