## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEON GREEN and WALDO TEJADA,
  *Plaintiffs*,

  v.                                                 No. 3:19-cv-1896 (JAM)

XPO LAST MILE, INC.,
  *Defendant*.

## RULING GRANTING MOTION FOR CLASS CERTIFICATION

Plaintiffs Leon Green and Waldo Tejada are delivery drivers who transport items like furniture and appliances from retail stores and warehouses to customers' homes. They filed this lawsuit against XPO Last Mile, Inc. ("XPO"), a third-party logistics company that specializes in merchandise deliveries. As relevant here, Green and Tejada claim that XPO has misclassified them as independent contractors rather than as employees and that XPO has violated Connecticut's employee wage laws by making deductions from their pay for expenses such as insurance and claims for damages to merchandise they have delivered.

Green and Tejada have now moved to certify a class of about 275 delivery drivers. I will grant their motion.

### BACKGROUND

XPO is a national logistics company that serves as a kind of delivery middleman for "big box" merchandise companies like Lowe's and Home Depot. As a third-party logistics provider and freight forwarder, it contracts with big box stores for the delivery of goods, then in turn

enters into delivery service agreements with motor carriers to ship the goods to the customers who have ordered them.[1]

XPO has contracted since November 2017 with approximately 318 carriers to perform last-mile deliveries in Connecticut.[2] XPO coordinates deliveries by its motor carriers from three kinds of locations in Connecticut: (1) its own warehouse facilities—called "last mile hubs"—in New Haven and Windsor; (2) loading docks at retail stores including Lowe's and Home Depot; and (3) the warehouses of retailers such as Bob's Furniture.[3]

XPO requires each carrier that it contracts with to operate as an incorporated business or limited liability company (LLC).[4] Both of the individual named plaintiffs in this action—Leon Green and Waldo Tejada—are the sole owners and single members of a LLC.[5]

Green has provided delivery services for XPO in Connecticut from 2008 to the present, while Tejada provided delivery services for XPO in Connecticut from January 2015 to June 2018.[6] Both Green and Tejada signed a contract titled "Delivery Service Agreement" with XPO on behalf of their respective companies.[7] This agreement specifies the responsibilities of each party, while using terms to implicitly and explicitly disavow the existence of any employer-employee relationship between XPO and the LLCs or the employees of the LLCs.[8]

---

[1] See Doc. #1 at 3 (¶ 14) (complaint); see also Hayes v. XPO Last Mile, Inc., 2017 WL 4900387, at *2 (W.D. Mich. 2017) (describing functions of XPO Last Mile, Inc. to provide "last mile" logistics for delivery services in more than 800 cities in the United States and working with more than 5,000 contract carriers nationwide).
[2] Doc. #73-3 at 3 (¶ 9) (declaration of Rebecca Shuford).
[3] Doc. #73-4 at 6 (deposition of Fernando Rabel).
[4] Doc. #73-4 at 7-8.
[5] Doc. #73-14 at 14 (Tejada owns Tejada Express LLC); Doc. #73-15 at 9 (Green owns LG Family LLC).
[6] Doc. #1 at 1-2 (¶¶ 2-3).
[7] XPO previously argued that Green and Tejada could not bring their claims in federal court due to a mandatory arbitration provision in XPO's delivery service agreements with the LLCs. But I concluded that this provision binds only the companies, not Green and Tejada themselves. See Green v. XPO Last Mile, Inc., 504 F. Supp. 3d 60 (D. Conn. 2020), motion to certify appeal denied, 2021 WL 1381326 (D. Conn. 2021).
[8] See Doc. #81-2 at 210 (stating in part the objectives of the agreement to achieve "delivery and installation services which meet the service levels of XPO Last Mile's customers" and that "[t]he manner and means of obtaining such results are entirely within the discretion of Contract Carrier"); id at 211 (Section 3.1: "Contract Carrier acknowledges that it maintains discretion and control to accomplish its obligations under this Agreement."); id. at

Green and Tejada filed this diversity class action complaint alleging that they are employees of XPO—rather than independent contractors—and that XPO has made certain deductions from their employee wages that are unlawful under Conn. Gen. Stat. § 31-71e.[9] According to Green and Tejada, XPO deducts from their wages costs such as for insurance and for damaged goods claims which are not allowed wage deductions under Connecticut law.[10]

For this state law claim, plaintiffs now move to certify a class under Fed. R. Civ. P. 23(b)(3) defined as:

> All individuals who personally or on behalf of their business entity, signed a Delivery Service Agreement with XPO and who personally performed deliveries for XPO full-time in Connecticut between November 2017 and the present.[11]

The plaintiffs define "full-time" as "personally making deliveries at least 80 percent of the days XPO assigns routes to the contractor," and restrict the class to contractors "who generally did so for at least 12 consecutive weeks, and who averaged at least four days a week of work for XPO."[12]

---

212 (Section 4.1: "It is expressly intended by the Parties hereto, and Contract Carrier hereby specifically warrants, represents and agrees, that Contract Carrier and XPO Last Mile are independent entities having their own established businesses," and that "XPO Last Mile and Contract Carrier intend that this Agreement is strictly between two independent entities and does not create an employer/employee relationship for any purpose."); *id.* at 214 (Section 5: stating in part that that the LLC "retains complete and exclusive direction and control over its employees and all those working for it in any capacity" and that "such persons shall not be considered employees of XPO Last Mile").

[9] Doc. #1 at 1-2 (¶¶ 2-3). The complaint also alleges a state law claim for unjust enrichment that is not at issue here.

[10] *Id*. at 6-8 (¶¶ 19, 25-26, 34).

[11] Doc. #73 at 1 (¶ 1). The plaintiffs initially included deliveries performed beginning in November 2016, but at oral argument their counsel agreed that claims prior to November 2017 were time-barred under Conn. Gen. Stat. § 52-596.

[12] Doc. #73-1 at 6 n.9; Doc. #73-3 at 3 (¶¶ 6-7). The class also excludes any driver who has more than five trucks performing deliveries. Doc. #73-3 at 3 (¶ 6).

3

**DISCUSSION**

The defendants oppose the class certification motion on the ground that Green and Tejada

lack standing. They otherwise argue that the plaintiffs cannot meet each of the requirements for

class certification.

### Standing

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and

"Controversies." U.S. Const. art. III, § 2, cl. 1. The Supreme Court has ruled that Article III

creates a constitutional "standing" requirement—that a federal court may adjudicate a plaintiff's

case only if the plaintiff establishes that they personally suffered a concrete injury that was likely

caused by the defendant's alleged wrongdoing and that would likely be redressed by a grant of

judicial relief. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *Silva v. Farrish*,

--- F.4th ---, 2022 WL 3650689, at *5 (2d Cir. 2022).[13]

XPO argues that Green and Tejada lack standing because the deductions at issue were

made from payments that XPO made to Green and Tejada's LLCs and that any harm was

suffered by the LLCs rather than by Green and Tejada. The argument has some superficial

appeal. After all, a plaintiff ordinarily lacks standing to complain about harms visited solely upon

a corporate entity that he owns or controls. *See Martin v. United Bridge Cap., LP*, 2022 WL

2166399, at *3 (2d Cir. 2022) (member of limited liability company lacked standing to sue

defendant who charged usurious rate in loan to limited liability company); *Dubois v. Maritimo

Offshore Pty Ltd.*, 422 F. Supp. 3d 545, 556 (D. Conn. 2019) (owner of limited liability

companies lacked standing as to injuries to boat owned by limited liability companies).

---

[13] For ease of readability, this ruling generally omits from case citations any internal quotation marks, brackets, ellipses, and similar extraneous markings.

4

Yet the existence of standing depends not just on corporate formalities but also on the nature of the underlying legal claim. The claim here is that Green and Tejada were employees—rather than independent contractors—under Connecticut law. Green and Tejada do not seek to enforce the contractual or other legal rights of their LLCs under the delivery service agreements but instead seek to enforce their independent and personal statutory employment rights under Connecticut law.

If Green and Tejada are right about their contention that they were employees, then they had a personal right to wage payments without deductions unauthorized by law. As many other courts have recognized, state wage laws are not defeated by the fact that a defendant may choose to make payments for labor services to a company rather than directly to an individual. *See DaSilva v. Border Transfer of MA, Inc.*, 377 F. Supp. 3d 74, 86 (D. Mass. 2020); *Maranzano v. S-L Distribution Co., LLC*, 2020 WL 7974332, at *4 (M.D. Pa. 2020); *Carrow v. FedEx Ground Pkg. Sys., Inc.*, 2019 WL 7184548, at *5-6 (D.N.J. 2019); *Padovano v. FedEx Ground Package Sys., Inc.*, 2016 WL 7056574, at *4 (W.D.N.Y. 2016).

Thus, I conclude that Green and Tejada have standing in light of the nature of the underlying right they assert to payment of wages as employees under Connecticut law. They have a concrete injury—loss of money—that is fairly traceable to XPO and that could be redressed by a grant of relief in the form of money damages.

### *Class certification*

Rule 23 of the Federal Rules of Civil Procedure permits a federal court to certify a class action by which named plaintiffs may litigate claims on behalf of a class of similarly situated and aggrieved class members. "Class actions under Rule 23 of the Federal Rules of Civil Procedure

are an exception to the general rule that one person cannot litigate injuries on behalf of another." *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 897 F.3d 88, 93 (2d Cir. 2018).

The plaintiffs must satisfy each of seven different requirements in order for me to grant their class certification motion. The first four of these requirements are that "(1) 'the class is so numerous that joinder of all members is impracticable' (numerosity); (2) 'there are questions of law or fact common to the class' (commonality); (3) 'the claims or defenses of the representative parties are typical of the claims or defenses of the class' (typicality); and (4) 'the representative parties will fairly and adequately protect the interests of the class' (adequacy)." *Barrows v. Becerra*, 24 F.4th 116, 130 (2d Cir. 2022) (quoting Fed. R. Civ. P. 23(a)). The next two requirements are that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 254 n.2 (2d Cir. 2021) (quoting Fed. R. Civ. P. 23(b)(3)). Lastly, Rule 23 has an "implied" requirement of ascertainability—that the class may be "defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d 250, 257 (2d Cir. 2017).

I will review each of these seven factors below. In doing so, I am mindful that I must make a definitive assessment of each factor—notwithstanding any overlap with the merits of the plaintiffs' claims—and that I must resolve any material factual disputes that are relevant to each requirement by a preponderance of the evidence. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013); *Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010).

I note as well that many other courts in highly similar lawsuits against XPO or similar companies have granted class certification motions. *See, e.g., Muniz v. XPO Last Mile, Inc.*,

--- F. Supp. 3d ---, 2022 WL 3916034 (D. Mass. 2022); *Gonzalez v. XPO Last Mile, Inc.*, 579 F. Supp. 3d 252 (D. Mass. 2022); *Alvarez v. XPO Logistics Cartage, LLC*, 2020 WL 6253322, *recon. denied sub nom. Varez v. XPO Logistics Cartage, LLC*, 2020 WL 7414747 (C.D. Cal. 2020); *Johnson v. Diakon Logistics*, 2020 WL 405636 (N.D. Ill. 2020); *Ouadani v. Dynamex Operations E., LLC*, 405 F. Supp. 3d 149 (D. Mass. 2019); *Carrow v. FedEx Ground Pkg. Sys., Inc.*, 2019 WL 7184548 (D.N.J. 2019); *DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389 (D. Mass. 2017); *Spates v. Roadrunner Transportation Sys., Inc.*, 2016 WL 7426134 (N.D. Ill. 2016). Although these decisions are a useful backdrop, I ground my analysis in this ruling on the particular facts of this case as well as underlying principles of federal class certification law and Connecticut employment law.

### Numerosity

Rule 23 requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Although there is no magic number to satisfy the requirement, numerosity is generally presumed to exist at a level of 40 or more members. *See Jin*, 990 F.3d at 263 n.20. XPO objects that the plaintiffs have not presented "evidence" that joinder would be impracticable, but it is self-evident to me that joinder of so many class members as named plaintiffs would be impracticable. Accordingly, the plaintiffs have satisfied the numerosity requirement for class certification.

### Commonality

Rule 23 requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement looks to whether the plaintiffs complain of the same conduct or practice and about the same kind of resulting injury. A court must focus not merely on whether common questions are raised but on the capacity of a class-wide proceeding

to generate common answers that may drive the resolution of the litigation. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011); *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022).

The disputed predicate for the plaintiffs' claims is their assertion that they qualify as "employees" rather than "independent contractors" under Connecticut law. Connecticut uses the so-called "ABC" test to distinguish between employees and independent contractors. This test presumes an individual to be an employee unless the putative employer can show each and every one of the following three A-B-C factors:

A.  that "such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact"; and

B.  that "such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed"; and

C.  that "such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed."

*Mujo v. Jani-King Int'l, Inc.*, 13 F.4th 204, 209 (2d Cir. 2021) (quoting Conn. Gen. Stat. § 31-222(a)(1)(B)(ii)).

It is important to appreciate that "[t]his statutory provision is in the conjunctive," which means that unless XPO "shows that *all three prongs* of the test have been met, an employment relationship will be found." *Sw. Appraisal Grp., LLC v. Adm'r, Unemployment Comp. Act*, 324 Conn. 822, 832 (2017) (emphasis added). Put differently, class certification may be granted if the

8

commonality requirement is established as to any one of the three "prongs" of the ABC test.

It is apparent to me that Prong A will involve class-wide factual proof. It focuses in part on each driver's duties "under his contract for the performance of service," and the record here shows that each one of the proposed class members was subject to the *same* delivery services agreement. It is hard to imagine how the evidence could be more common as to this issue.

XPO cites provisions of the delivery service agreement that expressly confer discretion and characterize the relationship as an independent contractor relationship.[14] But even so, because these provisions were in all the delivery service agreements, the significance of such provisions can be evaluated on a class-wide basis, and it is premature for me to decide the merits of the plaintiffs' misclassification claim at this time.

Even as to the additional query under Prong A of whether each driver was "in fact" free from control and direction, I am persuaded by the plaintiffs' showing that XPO utilized common practices and policies akin to the type of meticulous control that an employer would exercise over an employee rather than an independent contractor. For example, each driver must have a 24-foot or 26-foot truck, carry certain levels of insurance, charge certain standard pay-rates per stop, be subject to deductions from pay for damage claims, be subject to background checks, have the assistance of a helper who has been approved by XPO, carry an XPO identification badge, follow pre-assigned daily delivery routes in a pre-specified order, call customers 30 minutes prior to arrival, and log all their deliveries using an application on their phones and subject to XPO monitoring.[15] In short, "the degree of control [XPO] exercised over [its] drivers (the first prong of the test) is largely a matter of company policy, and company policies will

---

[14] Doc. #81 at 18.
[15] Doc. #73-1 at 8-12. To the extent some of these "in fact" requirements correspond to requirements imposed by the Delivery Service Agreement, they are nonetheless requirements that were carried out "in fact."

apply more or less equally to each driver." *Spates*, 2016 WL 7426134, at *3.

For Prong B and its initial focus on whether the drivers' services are performed "outside the usual course of the business for which the service is performed," this inquiry is not driver-specific but requires consideration of only XPO's business model to decide if what the drivers do is within or outside the usual course of XPO's business. *See Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1059-60 (7th Cir. 2016). As the Connecticut Supreme Court has recently ruled, "[i]n determining whether a particular activity is considered within an enterprise's 'usual course of business' under part B of the ABC test, we consider whether 'the enterprise performs the activity on a regular or continuous basis, without regard to the substantiality of the activity in relation to the enterprise's other business activities.'" *Vogue v. Adm'r, Unemployment Comp. Act*, 344 Conn. 321, 337–38 (2022).

As to the alternative focus of Prong B—whether "the service is performed outside of all the places of business of the enterprise for which the service is performed"—the evidence shows that the drivers operated from several types of common locations, whether they were one of two of XPO's own warehouse hubs, loading docks at particular big box stores, or particular big box store warehouses. Although the parties will likely dispute the degree of XPO's control over locations that it did not own, the limited number and type of locations are susceptible to common evidence and proof, and the applicability of Prong B can be resolved on a class-wide basis.

XPO also argues that federal law preempts Prong B, but this preemption issue itself is capable of class-wide resolution. In any event, the case XPO cites—*Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429, 438 (1st Cir. 2016)—involved a Massachusetts version of Prong B that includes only the usual-course-of-business sub-branch of Prong B. By contrast, the Third Circuit has rejected a preemption argument for a state ABC statute like Connecticut's that

includes both sub-branches of Prong B. *See Bedoya v. Am. Eagle Express Inc.*, 914 F.3d 812, 824-25 (3d Cir. 2019); *see also Costello*, 810 F.3d at 1055-57 (similarly rejecting Prong B preemption argument); *Portillo v. Nat'l Freight, Inc.,* 2022 WL 2078276, at *15-18 (D.N.J. 2022). But in light of the somewhat abbreviated treatment of the preemption issue in the parties' briefing, if this litigation advances to the point where I might need to consider merits evidence with respect to Prong B, XPO is welcome to raise the preemption issue anew.

For Prong C and its focus on whether the drivers are "customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed," this inquiry "seeks to discern whether the worker is wearing the hat of an employee of the employing company, or is wearing the hat of his own independent enterprise." *Sw Appraisal Grp.*, 324 Conn. at 835. As the Connecticut Supreme Court has made clear, "the appropriate inquiry … is whether the person engaged in covered employment *actually* has such an independent business, occupation, or profession, not whether he or she could have one." *Kirby of Norwich v. Adm'r, Unemployment Comp. Act*, 328 Conn. 38, 50 (2018) (emphasis added). This focus on a driver's actual business status rather than his right to conduct an independent business suggests a driver-specific inquiry.

In addition, courts examine many non-exclusive factors including: "(1) the existence of state licensure or specialized skills; (2) whether the putative employee holds himself or herself out as an independent business through the existence of business cards, printed invoices, or advertising; (3) the existence of a place of business separate from that of the putative employer; (4) the putative employee's capital investment in the independent business, such as vehicles and equipment; (5) whether the putative employee manages risk by handling his or her own liability insurance; (6) whether services are performed under the individual's own name as opposed to the

putative employer; (7) whether the putative employee employs or subcontracts others; (8) whether the putative employee has a saleable business or going concern with the existence of an established clientele; (9) whether the individual performs services for more than one entity; and (10) whether the performance of services affects the goodwill of the putative employee rather than the employer." *Sw Appraisal Grp.*, 324 Conn. at 839-40.

All these factors are driver-specific rather than mostly dependent—as for Prong A and Prong B—on XPO and its common business policy, model, and practices. For example, there is record evidence that Tejada's LLC did outside work for other companies while Green's LLC did not.[16] The plaintiffs proffer that "the record will show that it is extremely rare for a class member to be able to deliver for XPO and another business simultaneously … because XPO requires its contractors to provide deliveries on a full-time basis."[17] But they cite no record evidence for this assertion.

As for employing other workers, the record indicates that some LLCs operated nearly seven days a week, relying heavily on secondary drivers to drive as many as five trucks, while other LLCs operated with only one truck driven primarily by the business owner.[18] And with respect to other factors such as licensure, advertising, separate places of business, capital investment, and goodwill, the record is silent as to the putative class members.

The plaintiffs attempt to limit this variation by defining the proposed class to exclude owners who personally made deliveries less than 80% of the time during particular periods, but the following XPO contractors included on the plaintiffs' spreadsheet of proposed class members owned businesses that operated at least four days a week on average and who did not themselves

---

[16] Docs. #73-13 at 5; #73-14 at 20 (Tejada Express LLC provided delivery services four to five days a week for Pace Motor in 2018); Doc. #73-15 at 16-18 (LG Family LLC worked only with XPO and its predecessor company, 3PD).
[17] Doc. #73-1 at 22.
[18] Doc. #73-3 at 6-15.

drive a truck at all during certain portions of the relevant period: Joseph Frazier, Shamina Khan, Elvis Rodriguez Andeliz, Maria Valladares, and Andrew Benbow.[19] Many others drove more hours per week than these contractors but appear to have hired secondary drivers based on the disparity between their driving hours and the operating hours of their companies.[20] Still other contractors did all the driving themselves.[21]

The plaintiffs insist that some of the criteria—such as licensure—are subject to class-wide proof.[22] But it is hard to see how just a single or handful of sub-factors is likely to advance a class-wide resolution of the Prong C issue. The rest of the plaintiffs' arguments about how Prong C might be resolved by means of class-wide evidence are thin and speculative. All in all, the plaintiffs have not carried their burden to show that the resolution of the highly driver-specific inquiries of Prong C would be appreciably advanced by means of any common evidence in a class-wide proceeding.

Beyond showing that they were employees under the ABC test, plaintiffs must also show that XPO violated § 31-71e by making the claimed deductions from their wages. This issue also appears readily amenable to class-wide resolution because its focus is on the *types* of deductions commonly made by XPO—such as for insurance or damages to delivered goods—rather than anything that is peculiar to individual members of the proposed class. Each class member alleges a violation of the same law (§ 31-71e) by the same defendant (XPO) in the same way (deductions from the member's company).

---

[19] *See ibid.*

[20] *See* Doc. #73-6 at 8 ("[W]e could have a one-truck contractor who would only be on his truck, say, 20 percent of the time or we would have a multi-truck contractor that was on one truck all the time but not on his other trucks."); Doc. #81-2 at 226 (declaration of Dr. Stephen G. Bronars) (of the 318 contractors XPO worked with in Connecticut, "140 delivery service providers (or 44.0%) hired multiple drivers to assist them with XPO LM-tendered deliveries, while others utilized one delivery team for XPO LM-tendered deliveries").

[21] Doc. #73-3 at 6-15.

[22] Doc. #73-1 at 21-22.

Accordingly, I conclude that the commonality requirement has been met as to Prongs A and B of the ABC "employee" test and as to the issue of the lawfulness of the deductions made by XPO. On the other hand, I conclude that commonality has not been shown as to Prong C of the ABC "employee" test. "Therefore the Court will certify the proposed class so that the trier of fact can adjudicate prongs A and B on a class-wide basis, leaving prong C to be decided on an individual basis." *James v. Uber Tech.*, 338 F.R.D. 123, 139 (N.D. Cal. 2021) (finding predominance established as to Prong A and Prong B but not Prong C for class action by Uber drivers).

### *Typicality*

Rule 23 further requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members," and "[t]his requirement is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010).

Here, the plaintiffs have established that their claims arise from the same course of conduct as the claims of the class: that all the proposed class member drivers signed standardized service agreements on behalf of their business entities with XPO, that they were subject to the same policies and procedures for making deliveries, and that they were subject to the same policies with respect to their compensation and deductions made from their pay. Accordingly, I conclude that the plaintiffs have met the typicality requirement.

### *Adequacy*

Rule 23 further requires that "the representative parties will fairly and adequately protect

the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent" by means of assessing whether the named plaintiffs "possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). "[T]he proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members." *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). As noted above, it appears that Green and Tejada seek to pursue the same claims as other members of the defined class, and there is no indication that their interests diverge from those of other class members.

Nor am I convinced by XPO's arguments that Green and Tejada are not knowledgeable enough to represent the class. It appears that they are sufficiently invested in and committed to their roles to adequately represent the class. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 41 (2d Cir. 2009) (noting "general disfavor" toward "attacks on the adequacy a class representative based on the representative's ignorance" and rejecting such an argument).

XPO contends that because Green and Tejada passed along certain deductions to their drivers and helpers, they cannot adequately represent the class due to the concern of intra-class conflicts. But the proposed class here includes *only* LLC owner/drivers and not those who helped or worked for them. Therefore, XPO has not shown any intra-class conflict.

In addition, courts have "historically assessed the adequacy of class counsel under Rule 23(a)(4) even though that provision only concerns the adequacy of the class representatives." *Jin*, 990 F.3d at 263. "[C]lass counsel must be qualified, experienced and generally able to conduct the litigation." *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). Class counsel in this case has amply demonstrated its extensive experience in the

15

litigation of similar class actions involving claims by delivery drivers.[23] Accordingly, I conclude that the plaintiffs have satisfied the adequacy requirement for class certification.

### *Predominance*

Rule 23 further requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Scott v. Chipotle Mexican Grill, Inc.*, 954 F.3d 502, 512 (2d Cir. 2020). A court examining predominance must assess (1) "the elements of the claims and defenses to be litigated," (2) "whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief," and (3) "whether the common issues can profitably be tried on a class-wide basis, or whether they will be overwhelmed by individual issues." *Ibid*.

Moreover, the predominance inquiry does not require a plaintiff to prove that every element of the claim is susceptible to class-wide proof. *See Amgen*, 568 U.S. at 469. "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important maters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016).

As I have noted for the commonality factor above, the plaintiffs have established

---

[23] Doc. #73-1 at 25-26 (citing cases).

common issues as to Prongs A and B of the ABC test of employment status as well as with respect to the lawfulness of the deductions if they are classified as employees. The question is whether these common issues will predominate over the remaining individual issues that are necessary for the plaintiffs to be entitled to relief.

I start with the "employee" ABC test issue. For Prong A, it appears to me that there are few individual issues that will be necessary to resolve because Prong A focuses on the control-related policies and practices of XPO rather than on practices peculiar to individuals. Similarly, for Prong B, it appears to me that the focus will be on the nature of the delivery driver business in general as well as consideration of the limited *types* of business locations where the drivers perform their work, as distinct from the aggregate *number* of those business locations. This again suggests that the adjudication of common class-wide issues will predominate over individual-specific issues with respect to the "employee" status of those full-time delivery drivers who have signed a delivery service agreement with XPO on behalf of their LLC.

Although I have already concluded that Prong C does not meet the commonality requirement, each of the ABC prongs—as discussed above—are conjunctive requirements, such that if either Prong A or Prong B are established on a classwide basis, it would not be necessary to reach Prong C. The fact that it may not be necessary at all to reach Prong C diminishes the likelihood for purposes of the predominance inquiry that individual issues will overwhelm the issues subject to classwide resolution. *Cf. Costello*, 810 F.3d at 1060 (district court erred by concluding that common issues cannot predominate unless as to all three prongs of the ABC test).

Turning to the "deduction" issue, it appears that the lawfulness of the *types* of deductions (such as for damages to delivered goods or insurance) will be subject to common and class-wide

17

proof, even though the timing and particular amount of each driver's deductions will be individual-specific. Class-wide resolution of the lawfulness of particular types of deductions will facilitate individual damages calculations. And of course "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015).[24]

The plaintiffs have established that common issues will predominate over individual issues with respect to the issues of employee status and deductions. Accordingly, I conclude that the plaintiffs have satisfied the predominance requirement for class certification.

### Superiority

Rule 23 requires that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The rule further instructs consideration of "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." *Ibid.*

I have considered each of these factors and conclude that a class action is superior for the trial of class-wide issues as described above than any other available means or method for efficiently adjudicating the controversy. "Here, substituting a single class action for numerous trials in a matter involving substantial common legal issues and factual issues susceptible to

---

[24] As noted above, the class to be certified includes full-time drivers who were signatories to delivery service agreements and whose LLC operated as many as five trucks. Subject to the further views of the parties, I assume that the claim for damages of these class members will be limited only to those deductions that correspond to the class member's own driving activities as distinct from deductions attributable to the activities of any non-class-member who drove another one of any LLC's trucks.

18

generalized proof will achieve significant economies of 'time, effort and expense, and promote uniformity of decision.'" *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 131 (quoting advisory committee notes to Fed. R. Civ. P. 23). Accordingly, the plaintiffs have satisfied the superiority requirement for class certification.

> ### *Ascertainability*

Rule 23 contains "an implied requirement of ascertainability" which "demands that a class be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *In re Petrobras Sec.*, 862 F.3d at 260. Here, the class appears to be readily ascertainable by means of objectively determinable criteria as based on XPO's records to include drivers who signed a delivery services agreement with XPO and who personally performed deliveries full-time from November 2017. Accordingly, the plaintiffs have satisfied the ascertainability requirement for class certification.

### CONCLUSION

For the reasons stated above, the Court GRANTS the plaintiffs' motion for class certification (Doc. #73). The Court appoints the named plaintiffs Leon Green and Waldo Tejada as class representatives and appoints Lichten & Liss-Riordan, P.C. as class counsel.

It is so ordered.

Dated at New Haven this 22nd day of September 2022.

> /s/ *Jeffrey Alker Meyer*_____
> Jeffrey Alker Meyer
> United States District Judge