# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LEON GREEN and WALDO TEJADA,
  *Plaintiffs*,

  v.                                            No. 3:19-cv-1896 (JAM)

RXO LAST MILE, INC.,
  *Defendant*.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiffs Leon Green and Waldo Tejada have filed this action on behalf of a class of delivery drivers alleging that defendant RXO Last Mile, Inc. ("RXO") took illegal deductions from their wages in violation of Connecticut law and that RXO was unjustly enriched by misclassifying their drivers as independent contractors rather than employees.

RXO has filed a motion for summary judgment arguing that the terms of the contract between RXO and independent business entities formed by the delivery drivers preclude both claims. In the meantime, the plaintiffs have cross-moved for partial summary judgment to seek a finding that they and class members are employees of RXO under Connecticut state law. Because I conclude that RXO has shown that there are no genuine issues of fact to support the plaintiffs' claim for unlawful wage deductions and for unjust enrichment, I will grant RXO's motion for summary judgment and deny as moot the plaintiffs' cross-motion for summary judgment.

## BACKGROUND

RXO—formerly known as XPO Last Mile, Inc.—is a third-party logistics coordinator and freight forwarder that arranges and facilitates deliveries of large footprint consumer goods

on behalf of retailers to the customers who purchase them.[1] RXO engages with retailers such as Costco and Lowe's to coordinate "last-mile" deliveries of consumer goods to the homes of customers.[2]

RXO then contracts with motor carriers—which RXO refers to as Delivery Service Providers ("DSPs")—to complete these deliveries.[3] The contractual relationship between RXO and motor carriers is reflected in a standardized Delivery Service Agreement.[4]

Pursuant to the terms of the Agreement, each DSP must be a motor carrier authorized by the Federal Motor Carrier Safety Administration and own and operate an independent delivery business, typically a limited liability company ("LLC").[5] Motor carriers contracting with RXO may earn revenue on either a per-delivery-stop basis or by means of a flat, daily rate that varies based on services offered, locations, and the addition of services like "walk up" deliveries or fuel surcharges evaluated on an ad hoc basis.[6] The exact revenue structure for each motor carrier is set forth in Schedule A appended to each Agreement.[7]

The Delivery Service Agreement includes a provision for "Loss or Damage to Product."[8] It states that the contract carrier "shall be fully liable for the loss, theft, or destruction of or any damage to any merchandise in its custody or control in the delivery process" and that RXO "shall have the right to offset such damages from Contract Carrier's reconciliation for services

---

[1] Doc. #111-2 at 1 (¶ 1) (RXO Rule 56(a)(1) statement of material facts); Doc. #130 at 1 (¶ 1) (Plaintiffs' Rule 56(a)(2) statement of facts in opposition).
[2] Doc. #130 at 1 (¶ 1); Doc. #116 at 2-3 (¶¶ 4, 6); Doc. #128-1 at 2-4 (¶¶ 4, 6). RXO takes issue with the plaintiffs' representations that RXO "performs" deliveries or "provides" delivery services but does not otherwise deny that it contracts with specific businesses to arrange delivery of their goods to their customers' homes.
[3] Doc. #111-2 at 1 (¶ 2); Doc. #130 at 1-2 (¶ 2).
[4] Doc. #111-2 at 2 (¶¶ 4-5); Doc. #130 at 2-3 (¶¶ 4-5). The record includes various examples of these Delivery Service Agreements. *See, e.g.*, Doc. #19-4.
[5] *See, e.g.*, Doc. #128-5 at 2 (LG Family LLC Delivery Service Agreement).
[6] Doc. #111-2 at 2 (¶ 10); Doc. #130 at 5 (¶ 10). The plaintiffs dispute that drivers are able to negotiate their rates but do not take issue with the statement that revenue schemes vary as set forth in each specific Agreement.
[7] *See* Doc. #128-5 at 8 (¶ 9.2) ("Payment shall be made pursuant to any Schedule A(s) attached hereto."); Doc. #144 (sample Schedule A).
[8] Doc. #128-5 at 7 (¶ 7).

performed under this Agreement, provided such amounts are reasonably substantiated."[9] The

Delivery Service Agreement includes a similar provision for "Damage to Property."[10] And the

Agreement provides for an escrow fund to pay for damage or loss claims.[11]

      The Delivery Service Agreement states that "Payment shall be made pursuant to any

Schedule A(s) attached hereto and made part of this Agreement," but that RXO shall engage in a

weekly reconciliation process to "reconcile the amount of Payments due to Contract Carrier for

services rendered under this Agreement with any offsets for claims or losses resulting from

Contract Carrier's services under this Agreement as set forth in Sections 6, 7 and 8 above"

relating to loss or damage to products or property.[12] Following this reconciliation, RXO then

transfers the remaining sum of money to CMS/Openforce, a third-party settlement administrator,

to make the actual payment to the carriers.[13]

      The Delivery Service Agreement does not otherwise provide for any deductions to be

made from payments for service. It does, however, require that the carrier assume certain

expenses. For example, the carrier must "[b]ear all expenses associated with the employment of

such persons [whom it hires as employees], including, without limitation, wages, salaries,

employment taxes, workers' compensation coverage, health care, retirement benefits and

insurance coverages."[14] And it further provides that the carrier "at its own expense . . . shall

maintain insurance of the kinds and amounts specified in" Schedule D to the Agreement.[15]

Schedule D in turn prescribes specific insurance coverage requirements for motor truck and

---

[9] *Ibid.*
[10] *Id.* at 7-8 (¶ 8).
[11] *Id.* at 6-7 (¶¶ 6.1, 6.2, 6.3).
[12] *Id.* at 8 (¶¶ 9.2, 9.3).
[13] Doc. #111-2 at 3 (¶ 14); Doc. #130 at 6 (¶ 14).
[14] Doc. #128-5 at 6 (¶ 5(c)).
[15] *Id.* at 8 (¶ 12).

cargo liability, general liability and personal injury liability, excess liability, and workers' compensation ("As required by state authorities").[16]

The Agreement specifies that it constitutes a contract between RXO and the independent business entity only, and that the carrier "retains complete and exclusive direction and control over its employees and all those working for it in any capacity."[17] The Agreement states that it "is strictly between two independent entities and does not create an employer/employee relationship for any purpose."[18]

The plaintiffs Leon Green and Waldo Tejada own and operate DSP entities that contracted with RXO—LG Family LLC and Tejada Express LLC, respectively.[19] They have filed this action on behalf of a class of similarly situated delivery drivers alleging that RXO made illegal wage deductions in violation of Conn. Gen. Stat. § 31-71e (Count One) and that RXO was unjustly enriched by misclassifying its drivers as independent contractors rather than as employees because the misclassification allowed it to shift business costs to the plaintiffs that RXO would otherwise have had to bear (Count Two).

At the outset of this litigation, I denied RXO's motion to compel arbitration. I found that because the Delivery Service Agreements were between the limited liability companies and RXO only, RXO had not shown that individual drivers such as the plaintiffs should be bound by the Agreement's arbitration clause. *See Green v. XPO Last Mile, Inc.*, 504 F. Supp. 3d 60 (D. Conn. 2020).

---

[16] Doc. #90-1 (Schedule D).
[17] Doc. #128-5 at 6 (¶ 5).
[18] *Id*. at 4 (¶ 4.1).
[19] Doc. #111-2 at 1 (¶ 3); Doc. #130 at 2 (¶ 3). The plaintiffs dispute this statement but their response does not refute that the two named plaintiffs in this action did own and operate DSPs that were legally separate corporate entities.

I later granted a motion for class certification of about 275 delivery drivers working for RXO, with Green and Tejada as named plaintiffs. *See Green v. XPO Last Mile, Inc.*, 2022 WL 4380959 (D. Conn. 2022). The class I certified did not include all persons who drove trucks for RXO. Instead, it was limited to "[a]ll individuals who personally or on behalf of their business entity, signed a Delivery Service Agreement with [RXO] and who personally performed deliveries for [RXO] full-time in Connecticut between November 2017 and the present." *Id.* at *2. Thus, the class excluded persons who were drivers or employees of the carrier companies but who had not themselves signed a Delivery Service Agreement with RXO.

RXO now moves for summary judgment on both counts of the complaint.[20] The plaintiffs have cross-moved for partial summary judgment to seek a finding that they and class members are employees rather than independent contractors.[21]

DISCUSSION

The principles governing my review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues of fact but solely to decide if there are enough facts that remain in dispute

---

[20] Doc. #111.
[21] Doc. #114.

to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*);

*Union Mut. Fire Ins. Co. v. Ace Caribbean Mkt.*, 64 F.4th 441, 445 (2d Cir. 2023).[22]

### Count One—illegal wage deductions

RXO moves for summary judgment as to Count One of the complaint which alleges that

RXO engaged in unlawful wage deductions in violation of Conn. Gen. Stat. § 31-71e. That

statute provides in relevant part that an employer may not "withhold or divert any portion of an

employee's wages unless . . . the employer has written authorization from the employee for

deductions on a form approved by the commissioner."

RXO argues that, even assuming the plaintiffs were RXO employees, the deductions it

made from the gross amounts payable to the plaintiffs' LLCs did not amount to the

"withhold[ing] or divert[ing] [of] any portion of an employee's wages" as is prohibited under

§ 31-71e. Its argument critically turns on the definition of "wages" under Connecticut law.

Connecticut law defines "wages" as "compensation for labor or services rendered by an

employee, whether the amount is determined on a time, task, piece, commission or other basis of

calculation." Conn. Gen. Stat. § 31-71a(3). Although the plaintiffs rely on that portion of the

statute that measures wages by reference to compensation as determined by means of "time, task,

piece, [or] commission," RXO relies on the ending words of this definition that refer in open-

ended terms to compensation as determined by any "other basis of calculation." *Ibid.*

In *Mytych v. May Department Stores Co.*, 260 Conn. 152 (2002), the Connecticut

Supreme Court addressed how to define what constitutes "wages" under Connecticut law. The

facts in *Mytych* involved a class of plaintiff salespersons who were employed at department

stores and who earned compensation in accordance with a commission sales agreement. The

---

[22] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

agreement provided for compensation in the amount of an 8% commission on "net sales" which was defined in relevant part to mean gross sales minus customer returns. *Id.* at 155-56. The plaintiffs argued that the reduction of their compensation for customer returns amounted to an improper withholding or diversion of their wages in violation of Conn. Gen. Stat. § 31-71e. They also argued this reduction was a violation of Connecticut's anti-kickback law—Conn. Gen. Stat. § 31-73(b)—which provides in relevant part that "[n]o employer . . . shall, directly or indirectly, demand, request, receive or exact any refund of wages . . . or deduct any part of the wages agreed to be paid, upon the representation or the understanding that such refund of wages . . . or deduction is necessary to secure employment or continue in employment."

The Connecticut Supreme Court rejected the plaintiffs' arguments, concluding in essence that what the plaintiffs chose to characterize as improper deductions from wages were in fact inherent by the terms of the employment agreement to the very definition of what constituted "wages" in the first place. The court explained that while Connecticut laws provide "an enhanced remedy for the collection of wages," they do "not embody substantive standards to determine the amount of wages that are payable." *Id.* at 162. Citing the statutory definition of "wages" under Conn. Gen. Stat. § 31-71a(3), the court concluded that Connecticut law "*expressly leaves the determination of the wage to the employer-employee agreement*, assuming some specific conditions, such as a minimum hourly wage, are met." *Id.* at 163 (emphasis added).

Thus, the court rejected "the plaintiffs['] claim that wages accrue at the time the service is rendered; in this case, at the time the sale of shoes is completed" and that "any deduction that occurs after the rendering of services, i.e., after the completed sale, is a deduction from wages and prohibited by statute." *Ibid.* Instead, the "wages" due to the plaintiffs were calculated by reference to "the specific commission agreement . . . [which] provided that wages would accrue

or vest after the agreed to calculations were made to the plaintiffs' gross sales, including the deduction of the plaintiffs' pro rata share of unidentified returns." *Id.* at 163-64.

The Connecticut Supreme Court would later recognize *Mytych* to stand for the proposition that "when an employee has agreed to a specific formula for the calculation of . . . wages, the part of the formula that allows deductions does not constitute a deduction from earned wages." *Ziotas v. Reardon Law Firm, P.C.*, 296 Conn. 579, 592 (2010). Still later, the Connecticut Supreme Court has again cited and quoted *Mytych* with approval for the propositions that "the wage statutes, as a whole, do not provide substantive rights regarding *how* a wage is earned" and that "the Connecticut wage statutes do not purport to define the wages due; they merely require that those wages agreed to will not be withheld for any reason." *Geysen v. Securitas Sec. Services USA Inc.*, 322 Conn. 385, 394 (2016) (internal quotations and bracket omitted).

The Second Circuit has recently applied *Mytych* to conclude that wages include agreed-upon deductions from a worker's earned revenue. *See Mujo v. Jani-King Int'l, Inc.*, 13 F.4th 204 (2d Cir. 2021). The plaintiffs in *Mujo* were franchisees who contracted with a company to perform cleaning services for clients under the company name. *Id.* at 207-08. The franchise agreement between the plaintiffs and the company required the plaintiffs to pay "accounting fees, royalty fees, advertising fees, and insurance fees," which the company collected "by deducting them from the revenue it receives from customers." *Id.* at 208.

The Second Circuit rejected the plaintiffs' claims that these fees amounted to unlawful wage deductions. The court concluded that the gross customer revenue was "not the baseline 'wage' from which the Connecticut Minimum Wage Act prohibits deductions." *Id.* at 211. Rather, "even assuming that the [plaintiffs] are employees . . . their wages under the franchise

8

agreement are the funds that remain *after* Jani-King deducts its fees under the franchise agreement." *Ibid.*

The same holds true in this case. The plaintiffs' theory rests on the notion that their "wages" are solely those payments to which they are entitled to under Schedule A of the Agreement in terms of the payment rate for their particular services performed.[23] But the Agreement itself explicitly lays out the process by which revenue earned under Schedule A is reconciled with the value of lost or damaged goods before being paid out to the carriers. A "contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 103 (2014). When read in its entirety, the Agreement here makes clear that the final sum owed to the carrier includes deductions for losses and damages. And just as in *Mytych* and *Mujo*, any deductions provided for in the Agreement are inherent to the very definition of what the plaintiffs' "wages" are in the first place.

The plaintiffs misplace their reliance on *Weems v. Citigroup, Inc.*, 289 Conn. 769 (2008), a case involving whether an employer company's enforcement of certain stock forfeiture provisions violated Connecticut's wage statutes. For those employees in *Weems* who voluntarily left their employment with or were fired by the employer, they lost interests in stock that had been purchased during the course of their employment by means of employee contributions to a stock purchase plan. *Id.* at 773-74.

According to the plaintiffs, "the Court [in *Weems*] concluded that deductions taken from the employees' gross payments were deductions under the Connecticut Minimum Wage Act

---

[23] Doc. #129 at 13 (plaintiffs' contention that "the DSA expressly states that Plaintiffs are paid for completed delivery based on amounts listed in Schedule A which is attached to the DSA").

even though they were agreed to."[24] But that is not true. The Connecticut Supreme Court stated only that it was *assuming without deciding* that the employee contributions were deductions from wages. *See id.* at 783-84 (noting that "[w]e begin by assuming, without deciding, that the contributions to the plans were deductions from wages under § 31–71a(3), as explained by *Mytych v. May Dept. Stores Co.*, 260 Conn. 152, 159–60, 793 A.2d 1068 (2002)" and that "we assume that, under the plaintiffs' employment agreement with the defendants, the wages due to them would be the gross compensation amount that had accrued during the relevant pay period, with the contribution to the plans being, therefore, a deduction from that gross amount"). The Connecticut Supreme Court in *Weems* only assumed a proposition and did not purport to retreat from or overrule its decision in *Mytych*.

The plaintiffs further argue that the deductions allowed by the Agreement for loss and damage cannot be considered to be a part of their wages because they do not know in advance how much the deductions will be. But that is no different from the compensation schemes in *Mytych* and *Mujo*. In *Mytych*, deductions were defined in part as a percentage of customer returns, *see* 260 Conn. at 155-56, and a salesperson could not know in advance whether a customer was going to return an item. Likewise, in *Mujo*, deductions were defined in part to include fees for accounting, royalties, advertising, and insurance, *see* 13 F.4th at 208, and there was no suggestion that the franchisees knew those specific amounts in advance when they performed their services. Whether the deductions are a part of wages turns on whether they were agreed to in accordance with a calculation procedure or formula, not whether the specific amount of deductions was known by the plaintiffs at the time that they rendered their services.

---

[24] *Id.* at 2-3.

Beyond deductions or offsets for loss or damage to goods, the complaint alleges that there were "deductions for insurances (including auto liability, cargo, general liability, umbrella and workers' compensation insurance), gift cards, administrative costs such as processing fees, uniforms."[25] But the parties' statements of material facts address only the issue of deduction for loss or damage to goods.[26] Moreover, although the Agreement required contractors to assume some costs such as for insurance, it did not provide that these costs would be *deducted* by RXO from the amounts that RXO paid, much less that they be "withheld" or "diverted" as required to violate Conn. Gen. Stat. § 31-71e.

Regardless, even assuming that there were such deductions for items other than loss or damage to goods, the plaintiffs do not show that they were made in a manner that is not provided for or inconsistent with the terms of the Delivery Service Agreement. Instead, the plaintiffs' theory is that the Agreement improperly allowed for such deductions or offsets. At oral argument, plaintiffs made clear that their claim is based on deductions authorized by the Agreement, not on the basis of deductions outside the scope of the Agreement.[27] It is undisputed that RXO made payments "in accordance with the contractually specified reconciliation process."[28] Therefore, any such claims with respect to such additional deductions or offsets fail for the same reasons that I have explained with respect to deductions for lost or damaged goods—that is, because they were an agreed-to component of the calculation of the plaintiffs' wages rather than an unlawful deduction from wages.

---

[25] Doc. #1 at 6-7 (¶ 25).
[26] Doc. #130 at 5-6, 12-13 (¶¶ 11-13, 23); Doc. #128-1 at 28-29, 32-33 (¶¶ 73-75, 88).
[27] Doc. #150 at 15. The plaintiffs likewise claimed at the class certification stage that all unlawful deductions were "pursuant to the DSA." Doc. 73-1 at 5; *see also id.* at 18 (noting that the plaintiffs "signed identical DSAs" such that "[t]hey were subject to . . . the same policies for deductions").
[28] Doc. #130 at 10 (¶18).

The plaintiffs argue that the Agreement's payment formula violates Connecticut's anti-kickback statute, Conn. Gen. Stat. § 31-73(b). But that same argument was rejected in both *Mytych* and *Mujo*, because the deductions were agreed-upon and therefore under Connecticut law a component of the calculation of wages, rather than an unlawful refund or kickback of wages. *See Mytych*, 260 Conn. at 165 (noting that "the defendant's policy here does not violate §§ 31-71e and 31-73(b))"); *Mujo*, 13 F.4th at 213-14 ("[W]hile § 31-73(b) prohibits employers from seeking a 'refund of wages,' § 31-73(a) defines 'refund of wages' as '[t]he return by an employee to his employer . . . of any sum of money actually paid or owed to the employee in return for services performed,' and 'the sum of money . . . owed to the employee' is defined by the employment contract").[29]

The plaintiffs additionally argue that the Agreement is void against public policy because it misclassifies employees as independent contractors.[30] But as the Second Circuit observed in *Mujo*, "even if the [plaintiffs] should have been classified as employees under Connecticut law, *Mytych* forecloses the . . . § 31-71e claim." 13 F.4th at 211. Regardless of any misclassification, the holding in *Mytych* applies to employees and independent contractors alike: both can enter into a contractual agreement that defines wages to include deductions for certain items.

Lastly, the plaintiffs point out that—as I previously ruled when I denied RXO's motion to compel arbitration—the Delivery Service Agreements are between the motor carriers as corporate entities and RXO, rather than between the plaintiffs personally and RXO. So,

---

[29] The plaintiffs misplace their reliance on *Lockwood v. Pro. Wheelchair Transp., Inc.*, 37 Conn. App. 85 (1995), in which the Connecticut Appellate Court concluded that an employer violated the anti-kickback statute when it required an at-will employee to pay a $1,000 insurance deductible resulting from the employee's involvement in a traffic accident involving the employer's vehicle. *Id.* at 93. But *Lockwood* was decided before *Mytych*, and *Mytych* distinguished *Lockwood* on the ground that "[t]he amount of the deductible [in *Lockwood*] was not part of the employee's wages" but "was an amount completely separate and distinct from the money he had earned in his employment pursuant to any wage agreement he might have had with the employer." *Mytych*, 260 Conn. at 166.
[30] Doc. #129 at 10.

according to the plaintiffs, the deductions were not agreed to by them because they were not even parties to the Agreements.

But this argument is self-defeating. After all, the plaintiffs' theory of recovery in this case is that they were entitled to "wages" as calculated by payments due under Schedule A of the Agreement. Yet if the plaintiffs want to argue that—as non-parties to the Agreement—they did not agree to its provisions for deductions, then this same argument must also mean that they have no contractual right to be paid under Schedule A as they insist.

The plaintiffs must take the bitter with the sweet. Indeed, when I queried plaintiffs' counsel at oral argument that "I didn't think that there was any dispute here that your contention is they're entitled to be paid as stated in Schedule A," counsel responded: "Correct."[31] Plaintiffs' counsel went on to argue: "I'm not trying to say that the agreement is completely void. *They had this agreement*. I'm just dealing with the deductions because deductions have a special place in the Connecticut statutes. And if it is a deduction, that it has to meet the requirements of the statute."[32]

Apart from my conclusions concerning the formal contractual signatories at the early stage of this case when I addressed the motion to compel arbitration, the full summary judgment record now shows that the plaintiffs by their course of conduct personally agreed to be paid in accordance with all of the terms of the Agreement including to be subject to the deductions specified in the Agreement. A contrary conclusion would mean that the plaintiffs have no rights at all under the Agreement, including as they claim the rights to be paid as calculated under Schedule A of the Agreement.

---

[31] Doc. #150 at 17.
[32] *Id.* at 17-18 (emphasis added).

In short, there is no genuine issue of fact remaining to support the plaintiffs' claim that they were subject to unlawful wage deductions in violation of Conn. Gen. Stat. § 31-71e. Accordingly, I will grant RXO's motion for summary judgment as to Count One of the complaint.[33]

### Count Two—unjust enrichment

Count Two of the complaint alleges a claim for unjust enrichment. To establish a claim of unjust enrichment under Connecticut law, a plaintiff "must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006).

Unjust enrichment is a broad and flexible remedy, and "the ultimate question for courts . . . is whether, under a given set of circumstances, the party liable, to the detriment of someone else, obtained something of value to which the party liable was not entitled." *Mujo*, 13 F.4th at 213 (citing *Town of New Hartford v. Conn. Res. Recovery Auth.*, 291 Conn. 433, 452 (2009)). In order to survive summary judgment on an unjust enrichment claim, plaintiffs must provide "hard evidence . . . from which a reasonable inference" may be drawn that the defendants unjustly obtained a benefit to the detriment of the plaintiffs. *Id.* at 214.

Plaintiffs argue that Connecticut law bars an employer from contracting around its statutory obligation to furnish workers' compensation insurance for its employees. *See* Conn. Gen. Stats. §§ 31-284(b), 31-290; *Welch v. Arthur A. Fogarty, Inc.*, 157 Conn. 538, 545 (1969). According to the plaintiffs, because RXO misclassified them as independent contractors rather

---

[33] For the same reasons that the Second Circuit declined to certify to the Connecticut Supreme Court questions concerning the issue of how to define wages and lawful deductions under Connecticut law, *see* 13 F.4th at 214-16, I also decline plaintiffs' request to certify such questions to the Connecticut Supreme Court.

than employees, this allowed RXO to be unjustly enriched by allowing it to shift the burden to the plaintiffs to pay for workers' compensation insurance rather than RXO's assuming the burden itself.

As noted above, the Agreement required contract carrier companies to "[b]ear all expenses" for their *own* employees, including for "workers' compensation coverage."[34] And it further required that the carrier company provide "at its own expense" such workers' compensation insurance "[a]s required by state authorities."[35] But even accepting that the contract carrier companies were required to assume such expenses, there is no evidence that RXO required the plaintiffs themselves to pay for their own workers' compensation insurance.

The plaintiffs point to business ledgers from a third party, CMS/Openforce, that show regular deductions for items including "Workers Compensation Insurance" and "Occupational Accident."[36] But these statements reflect money paid by RXO to the contract carriers, not to the individual plaintiffs. The ledger for plaintiff Green, for example, indicates that it was "[p]repared for LG Family LLC."[37] Because RXO's contractual agreement was with the LLCs, not the individual drivers, it would make no sense for RXO to pay the plaintiffs directly. So while the statements show that deductions were taken from the amount paid by RXO to the contract carriers, they do not show that the plaintiffs themselves bore any of those costs, much less that RXO required them to do so.

---

[34] Doc. #128-5 at 6 (¶ 5(c)).
[35] *Id.* at 8 (¶ 12); Doc. #90-1 at 22 (Schedule D); *see also* Doc. #151-3 (Schedule D for Tejada Express requiring furnishing of certificate of insurance for workers' compensation or occupational accident coverage).
[36] Doc. #151 at 3; Doc. #151-6. The plaintiffs describe these worksheets as "pay statements" from CMS/Openforce but the actual sheets are titled "Self Employment Business Ledger."
[37] Doc. #151-6. The ledger for Tejada states that it was prepared for "Waldo Tejada" rather than for his LLC. *See* Doc. #151-7. As the defendant explains this is because Tejada contracted with CMS before he established Tejada Express LLC, the entity that contracted with RXO. *See* Doc. #156 at 6.

Nor do the plaintiffs demonstrate that amounts paid by the contract carriers for workers' compensation or occupational accident insurance went toward the plaintiffs' own insurance coverage, rather than for other employees of the contract carriers. Green and Tejada did not testify that they received workers' compensation from their own carrier companies (Green stated that he instead took out an occupational accident policy but did not elaborate).[38] But Tejada Express LLC and LG Family LLC provided its other employees, including helpers and other drivers, with workers' compensation plans.[39] This shows that the insurance deductions reflected in the Openforce statements paid for coverage of other employees of the companies rather than for Tejada or Green.

These other employees of the contract carriers are not necessarily members of the class, and there is no claim that they also should have been considered employees of RXO. *See XPO Last Mile, Inc.*, 2022 WL 4390959 (certifying a class composed only of delivery drivers who signed contract carrier agreements with RXO). And so even if RXO had classified the plaintiffs as its employees, the contract carriers would still have had to pay for workers' compensation and other insurance coverage for their non-plaintiff employees. The "detriment" of these insurance

---

[38] *See* Doc. #117-12 at 33 (Green deposition) ("Q. [D]id you get workers' comp through LG Family LLC? A. No I took—what is it called? Q. An occupational accident policy? A. Yeah, yeah, that's the one, yes."); Doc. #128-9 at 15 (Tejada deposition) ("Q. Did Tejada Express LLC provide you with workers' compensation insurance? A. For me? Q. Yes. A. I don't remember that."). To the extent Tejada and Green's subsequent supplemental affidavits (Docs. #151-1 and #151-2) conclusorily contradict their prior deposition testimony, I decline to give weight to the later-filed contradictory affidavits. *See In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013) (noting that "the 'sham issue of fact' doctrine . . . prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony").

[39] *See* Doc. #128-10 at 5 ("Q. Did [Tejada Express] provide its employees workers' compensation insurance? A. Yes."); Doc. #128-9 at 15 ("Q. Did Tejada Express LLC provide Felix Olguin workers' compensation insurance? A. Yes."); Doc. #117-12 at 33 ("Q. Did LG Family LLC provide workers' comp coverage for its employees? A. Yes, for—yes, for most of them, yes. Not the part-timers, but yes. Q. Just the full-timers? A. Yes. I believe it was all of them."); *see also* Doc. #117-12 at 34 ("Q. LG Family offered workers' compensation to James Searcy from November 2020 to November of 2021; is that correct? A. He had insurance, yes, but not on that truck" continuing a conversation about how the workers' comp policies covered specific workers driving specific trucks).

costs is therefore not traceable to RXO's alleged misclassification of the plaintiffs as independent contractors rather than employees.

An unjust enrichment claim may also involve a transfer of a benefit from a third party to a defendant "when the plaintiff has a superior equitable entitlement to that benefit." *Geriatrics, Inc. v. McGee*, 332 Conn. 1, 25 (2019). But the standard for such an indirect unjust enrichment claim is high—"the plaintiff must prove that it has a better legal or equitable right to the disputed benefit than the defendant" and that "its right is both recognized, and accorded priority over the interest of the defendant." *Ibid.* Because it appears that the insurance deductions went towards coverage for the contract carriers' other employees rather than the plaintiffs, the plaintiffs cannot show that their interest in the insurance deductions was a "paramount interest of the kind recognized in law or equity," and so any indirect claim for unjust enrichment based on the plaintiffs' third-party status also fails. *Ibid.*

Because there is no genuine fact issue to suggest that RXO required the plaintiffs themselves to personally pay for workers' compensation insurance, I will dismiss the plaintiffs' unjust enrichment claim to the extent that it is based on the plaintiffs' claim that RXO was unjustly enriched by requiring the plaintiffs to pay workers' compensation insurance premiums that the law required RXO to pay in the first instance. While Count Two of the complaint additionally lists "employer payroll taxes, administrative fees, fuel and vehicle maintenance costs" as examples of business costs RXO shifted to the plaintiffs, the claim is underdeveloped in light of subsequent briefing and the record at summary judgment which focus almost exclusively on workers' compensation as the cost that was allegedly unjustly shifted to the plaintiffs in violation of Connecticut law.[40] In any event, the plaintiffs do not show that it was against public

---

[40] *See, e.g.*, Doc. #129 at 9-10; Doc. #155 at 1.

policy for RXO to shift these additional costs to the contract carriers. Nor do they show a genuine issue of fact that RXO was unjustly enriched by any such shifting of these costs.

All in all, there is no "hard evidence . . . from which a reasonable inference" may be drawn that RXO unjustly obtained a benefit to the detriment of the plaintiffs. *Mujo*, 13 F.4th at 214. Accordingly, I will grant RXO's motion for summary judgment on the plaintiffs' unjust enrichment claim. *See Mujo v. Jani-King Int'l, Inc.*, 431 F. Supp. 3d 18, 43-44 (D. Conn. 2019) (granting summary judgment on unjust enrichment claim where plaintiffs failed to identify the fees added beyond the value of the franchise agreement), *aff'd on other grounds Mujo*, 13 F.4th 204; *Levy v. World Wrestling Ent., Inc.*, 2009 WL 455258, at *3 (D. Conn. 2009) (dismissing employee misclassification claim of unjust enrichment stated as a "legal conclusion without factual substantiation" and noting that "[w]here parties have an express contract which delineates the rights and obligations with respect to services to be provided and the compensation to be paid therefor, unjust enrichment does not lie"). Accordingly, I will grant RXO's motion for summary judgment as to Count Two of the complaint.

### CONCLUSION

For the reasons stated above, the Court GRANTS the defendant RXO's motion for summary judgment (Doc. #111). In light of the granting of the defendant's motion, the Court DENIES as moot the plaintiffs' cross-motion for partial summary judgment with respect to their employment status (Doc. #114).

The Clerk of Court shall enter judgment and close this case.

It is so ordered. Dated at New Haven this 24th day of August 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge

18